UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL CASE NO. |
| | : | 3:13-CR-229 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN BOHANNON, | : | DECEMBER 15, 2014 |
| Defendant. | : | |

**RULING RE:  MOTION TO SUPPRESS EVIDENCE (Doc. No. 134)**

**I.     INTRODUCTION**

Before the court is defendant Jonathan Bohannon's Motion to Suppress

Evidence (Doc. No. 134).  Bohannon argues that the government's search of Shonsai

Dickson's car and apartment – the apartment at which he was staying when he was

arrested – violated his Fourth Amendment rights.  On August 22, 2014, the court held

argument on Bohannon's Motion to Suppress Evidence.  The court conducted an

evidentiary hearing on the Motion on November 13, 2014.

For the reasons that follow, Bohannon's Motion is granted in part and denied in

part.

**II.     BACKGROUND AND FACTUAL FINDINGS**

On December 4, 2013, Magistrate Judge Holly B. Fitzsimmons signed an Arrest

Warrant (Doc. No. 3) based on the government's Criminal Complaint (Doc. No. 1),

which alleged that Bohannon committed Conspiracy to Distribute and to Possess with

Intent to Distribute Narcotics, in violation of sections 841(a)(1), 841(b)(1)(B), and 846 of

title 21 of the United States Code, as well as Use of a Communications Facility in

1

Furtherance of a Narcotics Trafficking Felony, in violation section 843(b) of title 21 of the United States Code.

In the early hours of December 5, 2014, law enforcement officers, including agents of the Federal Bureau of Investigation (the "FBI") and detectives of the Bridgeport Police Department, prepared their arrest operation at Central High School, which is in Bridgeport, Connecticut.  The officers' original plan was to arrest Bohannon in his home, which was located at 103 Crestview Drive in Bridgeport, Connecticut. However, the officers' arrest plan changed when Special Agent ("SA") Michael Zuk, the agent in charge of the case against Bohannon and his co-defendants, received information that Bohannon's cell phone was within an area that did not include his residence.[1]  The cell phone data was not able to pinpoint exactly where Bohannon's phone was, but it gave a general area based on the location of the cellular tower with which Bohannon's phone had most recently interacted.[2]  The location information provided by Verizon according to the wiretap warrant included a residence located at 34 Morgan Avenue, which is also in Bridgeport, Connecticut.[3]  The location of 34 Morgan

---

[1] The government had obtained a warrant to receive cellular tracking information from the provider of Bohannon's cellular service.

[2] The court understands the technology used by the officers in this case to be as follows:  The officers received data from the cellular service provider that indicates the tower with which Bohannon's phone most recently interacted.  Based on the location of this tower, the cellular company can estimate an area within which the phone is most likely located.  This assumes that the phone interacted with the tower closest to the cell phone, although that assumption is not necessarily correct because a phone will interact with the tower that has the strongest signal, which is not always the nearest tower to the cell phone.  See Alexandra Wells, Ping! The Admissibility of Cellular Records to Track Criminal Defendants, 33 St. Louis U. Pub. L. Rev. 487, 493 (2014).

[3] SA Zuk's testimony established that the cellular location information indicated that Bohannon's "phone was in the sector that would include 34 Morgan . . . which was nowhere near Crestview . . . ." Although SA Zuk is not an expert in cellular location technology, he did testify that he had used this type information in the past and that it was "generally helpful to find . . . where a person is."  Thus, this

Avenue is roughly two miles southeast of 103 Crestview Avenue.  In addition to 34 Morgan, the area indicated by the cellular location information included many other buildings.

Having received this information, SA Zuk told the agents to conduct the arrest operation at 34 Morgan because of Bohannon's perceived association with that address.  See infra Part III.C.

The officers proceeded from Central High School to 34 Morgan, which took only a short time because the two properties abut each other.  Once the officers arrived at 34 Morgan, SA Ryan James and other officers knocked and announced their presence at the front door.  Meanwhile, Bridgeport Police Detectives Paul Ortiz and Thomas Scholl, went to the back entrance of Dickson's second floor apartment and knocked on the door.  Having heard no response, Detectives Ortiz and Scholl opened the door, which was unlocked, and entered the apartment.  The officers at the front door continued to wait outside the apartment.

Certain details of what happened in the apartment are disputed, but the general outline of what occurred is relatively simple.[4]  Dickson awoke to her sister informing her that someone was knocking on the front door.  Two officers then entered the apartment into the kitchen, where they saw Dickson briefly before she entered another room.  The officers followed Dickson into what turned out to be a bedroom, where they saw

---

knowledge contributed to SA Zuk's belief that Bohannon was in the area indicated by Verizon.  Notably, Defendant's Exhibit 101 suggests that Morgan Street is located outside the relevant cell tower's "coverage area," which is designated by a colored pie.  However, Exhibit 101 was not offered for such an area because SA Zuk denied that it contained the information he relied upon.

[4] To the extent that there was conflicting testimony, the court resolves those conflicts as stated above.

Bohannon lying in a bed.[5]  Dickson stood next to the bed on the side closer to the doorway, and Bohannon was lying on the side of bed closer to the window.  The officers stated that they had a warrant for Bohannon's arrest.  Bohannon stood up next to his side of the bed, where he was next to the windows and a closet.  The officers then approached Bohannon's side of the bed, looked around quickly, and began placing Bohannon under arrest.  Before Bohannon was handcuffed, Detective Ortiz left the bedroom and walked to the front door, which he opened for the rest of the arrest team to enter.

SA James and the other agents had waited for about eight minutes at the front door before Detective Ortiz let them in the apartment.  The arrest team entered the bedroom to find Dickson standing on one side of the bed and Bohannon on the other.[6]  Officer Scholl stood near Bohannon, but he had not yet handcuffed him.  SA James testified that, as he and Task Force Officer ("TFO") Jason Guerrara approached Bohannon and Officer Scholl, Officer Scholl indicated to him to look under the bed.  As SA James held Bohannon and TFO Guerrara put him in handcuffs, SA James looked under the bed and saw bags containing white powder.  He identified the substance as crack cocaine.

---

[5] Dickson testified that the officers entered her bedroom while she and Bohannon were both still in bed.  However, the only difference between the two accounts – whether and where Dickson was standing – is not material to the legal analysis.
[6] Detective Ortiz's testimony regarding where everyone was standing in the bedroom at this point was inconsistent with both Dickson's and SA James's testimony.  The court credits Dickson's and SA James's testimony on this point given the consistency of their testimony and the uncertainty with which Detective Ortiz seemed to recall this part of the morning.

At some point, Bohannon was allowed to put a pair of pants on.  Before Bohannon put the pants on, an officer searched the pants and found a large amount of cash.  Bohannon was handcuffed and brought into the kitchen.

At about the same time, Dickson was removed from the room and brought to the dining room.  Dickson testified that the officers were kind to her.  Indeed, on their way to the dining room, the officers allowed her to go into the bathroom unaccompanied so that she could brush her teeth.  After she and Bohannon were both removed from the bedroom, Dickson said that officers had gone into the bedroom to retrieve Bohannon's shoes.  After that, officers came to the dining room and told her that they had found crack cocaine while conducting an "arms-length" search.  Dickson had been a Criminal Justice major in college, and she had some understanding that officers were allowed to conduct a limited search, incident to an arrest, of the area in which the arrestee could reach for a weapon or destructible evidence.  The officers informed her that she and her sister, who shared the apartment with her, could be arrested based on the drug evidence the officers had found.[7]  As the officers explained this, Dickson became upset and Bohannon began shouting from the kitchen, confessing that everything was his. The officers asked for her consent to search the apartment, and they told her they would obtain a search warrant if she did not consent.  Dickson gave the officers verbal

_____

[7] SA James testified that he had only told Dickson that she could be arrest based on the drugs. However, the court credits Dickson's testimony that she was advised that she and her sister could be arrested and that the officers could obtain a search warrant.  Notably, other officers were in Dickson's presence around the time that she gave her consent.  Indeed, another officer, not SA James, explained the consent form to Dickson.  Thus, the testimony of Dickson and SA James are not necessarily in conflict.

consent to search.  Dickson signed a form consenting to the search of her apartment after she read the form to herself and the officers read it out loud to her.

Later, although it is not clear exactly when, the officers sought her consent to search her cars, which they believed Bohannon had been using.  Dickson gave her consent verbally and then on the consent form.  The officers also presented her with her Miranda rights, and Dickson then signed a form acknowledging those rights.

After the officers obtained Dickson's consent to search the apartment, they found guns and ammunition in the bedroom closet next to where Bohannon had been sleeping, as well as more crack cocaine, a digital scale, and cash in a dresser drawer in the bedroom.  With Dickson's consent to search her car, the officers found another gun in the Camry.

Bohannon was later charged by a Grand Jury on four counts.  Count One of the Indictment (Doc. No. 14) charges Bohannon with Conspiracy to Distribute and to Possess with Intent to Distribute Narcotics.  Count Five charges him with Possession with Intent to Distribute Cocaine Base.  Count Fifteen charges him with Possession of Firearms and Ammunition by a Convicted Felon.  Finally, Count Sixteen charges him with Possession of Firearms in Furtherance of Drug Trafficking Crimes.  Counts Five, Fifteen, and Sixteen are based on the evidence found in Dickson's apartment and car on December 5, 2013.

III.   **DISCUSSION**

Bohannon's Motion to Suppress Evidence presents a number of issues.  The court must first consider: (1) whether Bohannon had a privacy interest in either the searched apartment or in the searched cars; and (2) whether the government needed to

have a search warrant in order to find and arrest Bohannon in Dickson's apartment. Because the court concludes that Bohannon had a privacy interest in the apartment and the government did not need a search warrant, the court must then determine: (3) whether the government's belief that Bohannon was in Dickson's apartment was reasonable; (4) whether the government's searches under the bed and in the pockets of Bohannon's pants were valid; (5) whether any illegality tainted Dickson's consents, and if so, whether that taint had dissipated before the consents were given; and (6) whether Dickson's consents to search were voluntary.  Finally, the court must decide whether the exclusionary rule should not apply based on Herring v. United States, 555 U.S. 135 (2009).

      With respect to the search of Dickson's Toyota Camry, the court concludes that Bohannon cannot challenge the legality of that search because he had no privacy interest in the car.  However, the court also concludes that: Bohannon had a privacy interest in the apartment; the government did not have a reasonable basis to believe that Bohannon was present in the apartment; the evidence obtained under the bed and in the pockets of Bohannon's pants was fruit of the illegal entry; and that Dickson's consent to search her apartment was both tainted by the illegal entry and involuntary. Finally, the court concludes that Herring does not prevent the application of the exclusionary rule to this case.

      A.    Bohannon's Privacy Interest

      The "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded

place." Rakas v. Illinois, 439 U.S. 128, 143 (1978) (citing Katz v. United States, 389 U.S. 347, 353 (1967)).  An overnight guest in another's home has a legitimate expectation of privacy; such a guest therefore has standing to challenge unlawful searches of that home.  See Minnesota v. Olson, 495 U.S. 91, 99 (1990).

Bohannon was an overnight guest in Dickson's apartment, and he therefore had a legitimate expectation of privacy there.  It appears that he would go to Dickson's apartment to eat, and he would stay over on occasion.  Thus, he can challenge the search of Dickson's apartment.[8]

Bohannon's privacy interest in the cars is another matter.  "One who borrows a car from the owner has a reasonable expectation of privacy in the property."  Gordon Mehler, John Gleeson, and David C. James, Federal Criminal Practice: Second Circuit Handbook § 17-3, at 309 (14th ed. 2014) (citing United States v. Pena, 961 F.2d 333, 337 (2d Cir. 1992)); see also United States v. Ponce, 947 F.2d 646, 649 (2d Cir. 1991) ("To mount a challenge to a search of a vehicle, defendants must show, among other things, a legitimate basis for being in it, such as permission from the owner.").  However, once the car is returned, the borrower gives up his privacy interest in the vehicle.  Cf. United States v. One 1986 Mercedes Benz, VIN WDBEA30D2GA143459, 846 F.2d 2, 4 (2d Cir. 1988) ("We believe that by lending the Mercedes to [driver], [owner] abandoned any legitimate expectation of privacy in the area searched and thus may not now contest the legality of the search.").  If, as One 1986 Mercedes Benz held,

---

[8] The government seems to argue that Bohannon had no privacy interest in the apartment because of Dickson's testimony that he was not allowed in the apartment with guns or narcotics.  See Gov't Resp. (Doc. No. 397) at 5.  However, it does not cite, and the court was unable to find, any cases in support of this theory.

an owner gives up a reasonable expectation of privacy by lending the car to another, then a fortiori a borrower gives up any expectation of privacy in returning the car to the owner.

Here, Bohannon had been borrowing Dickson's Toyota Camry – the car in which the officers found the gun – on December 4, 2013.  After Dickson got out of work at 8:00 that night, Bohannon met her in front of her house in order to return the Camry and to borrow the rental car Dickson had been using that day.  Thus, Bohannon no longer had any right to use, possess, or exclude others from using or entering the Camry. Therefore, Bohannon had no reasonable expectation of privacy in that car after its return, so he cannot assert any violation of his Fourth Amendment rights with respect to the search of it.[9]

B.     The Government Did Not Need a Search Warrant to Find and Arrest Bohannon in Dickson's Apartment

Relying on Steagald v. United States, 451 U.S. 204 (1981), and United States v. Lovelock, 170 F.3d 339 (2d Cir. 1999), Bohannon argues that the government was required to obtain a search warrant to enter Dickson's residence.  See Def.'s Supplemental Mem. (Doc. No. 362) at 2–7.

As the Second Circuit has explained, the Supreme Court in Steagald "ruled that a search warrant was necessary to protect the privacy interests of a third party whose home was searched for the subject of an arrest warrant."  United States v. Snype, 441

_____

[9] Bohannon did appear to have a privacy interest in Dickson's rental car, which he borrowed the night of December 4, 2013.  He had not yet returned it and abandoned that privacy interest because Dickson did not know when Bohannon had arrived at her house that night.  The first time she woke up was when her sister informed her that someone was knocking on the door.  Thus, with Dickson's permission to use the rental car from the night before, Bohannon could have left Dickson's house in her car without Dickson knowing he had ever been there.  However, the officers found no evidence in the rental car.

F.3d 119, 133 (2009).  The Second Circuit cautioned that "the Court specified that its ruling applied only to challenges raised by the third-party resident.  It left open the question 'whether the subject of an arrest warrant can object to the absence of a search warrant when he is apprehended in another person's home.'"  Id. (emphasis added) (quoting Steagald, 451 U.S. at 219).  Moreover, the Second Circuit stated that it "has yet to rule on [the] issue,"[10] and it noted that "a number of [its] sister circuits have held that Steagald protection does not extend" to the subject of an arrest warrant apprehended in another's home.  Id.  The court explained the reasoning of the other circuits:

> Fourth Amendment rights are personal and cannot be asserted vicariously, and . . . requiring police who already hold an arrest warrant for a suspect to obtain a search warrant before they can pursue that suspect in a third party's home would grant the suspect broader rights in the third party's home than he would have in his own home under *Payton*.

Id. (citing United States v. Agnew, 407 F.3d 193, 196–97 (3d Cir.2005); United States v. Kaylor, 877 F.2d 658, 663 n.5 (8th Cir. 1989); United States v. Underwood, 717 F.2d 482, 483–86 (9th Cir. 1983) (en banc); United States v. Buckner, 717 F.2d 297, 299–300 (6th Cir. 1983)).[11]  At least one district court in the Second Circuit has adopted the reasoning of these circuits.  See United States v. Pabon, 603 F. Supp. 2d 406, 415 (N.D.N.Y. 2009).

---

[10] Before Steagald, the Second Circuit held "that police may enter a dwelling to execute an arrest warrant for a person other than its owner or tenant where there exists 'reasonable belief' that the party sought will be found therein."  United States v. Manley, 632 F.2d 978, 983 (2d Cir. 1980).

[11] The Second Circuit acknowledged that the First Circuit had "assum[ed], without deciding, that arrestee may object to police entry into third party's home without a search warrant."  Id. (citing United States v. Weems, 332 F.3d 18, 23 n.3 (1st Cir. 2003)).

The court agrees with the reasoning of these circuit courts.  It would make little sense to grant Bohannon greater protection in Dickson's apartment than in his own residence.  For the reasons set forth in the above-cited cases, the government did not need a search warrant in order to arrest Bohannon in Dickson's residence.

The court acknowledges that some of the cases cited by Bohannon contain language supporting his view.  See United States v. Lovelock, 170 F.3d 339, 344 (2d Cir. 1999) (stating in dicta that "[t]he principle discussed in Payton, allowing officers to enter the residence of the suspect named in the arrest warrant, does not authorize entry into a residence in which the officers do not believe the suspect is residing but believe he merely is present").  However, the Second Circuit in Snype – decided after Lovelock – was clear that it had not previously addressed the issue.  Snype, 441 F.3d at 133. Thus, in the absence of binding Second Circuit authority, the court is persuaded by those circuit courts that have considered the issue.

C.     The Government Did Not Have a Reasonable Belief that Bohannon was in Dickson's  Apartment

Next, Bohannon argues that, even if the government did not need a search warrant to arrest him in Dickson's residence, it was required to have a reasonable belief that he was present in the apartment, and it had no such reasonable belief.

In order for officers to enter a residence of another to find and arrest the subject of the arrest warrant, the Second Circuit requires a reasonable basis for believing that the subject of the warrant is on the premises.  See Snype, 441 F.3d at 133 (stating that, in order for the government to "support entry into [a third-party's] home without a search warrant," it must provide a "reasonable basis for believing that [the defendant] was then on the premises"); see also United States v. Manley, 632 F.2d 978, 983 (2d Cir. 1980).

"[T]he 'reasonable belief' standard . . . may require less justification than the more familiar probable cause test."  Manley, 632 F.2d at 983; see also United States v. Lauter, 57 F.3d 212, 215 (2d Cir. 1995) (noting that the district court "applied too stringent a test" when holding that officers must have probable cause to believe that a house is an arrestee's residence, instead of a reasonable belief).

Notably, the Second Circuit has not discussed the issue extensively.  However, the court finds guidance in the Second Circuit's decisions, and those of other circuits, applying the second prong of the test in United States v. Payton, 445 U.S. 573 (1980), which requires officers to have a reason to believe that the subject of an arrest warrant is present in her own house in order for the officers to enter.[12]  Id. at 603.  Typically, these cases involve an informant or eyewitness indicating that the subject of the arrest warrant is either at the location presently or would be at the location at a certain time.  See, e.g., Lauter, 57 F.3d at 215 ("The CI also told Graham that Lauter was unemployed and typically slept late, thus supporting a reasonable belief that Lauter was present in the apartment when the warrant was executed."); United States v. Hardin, 539 F.3d 404, 421 (6th Cir. 2008) ("A common feature of [cases concluding that officers had a reasonable belief] is recent, eyewitness evidence connecting the suspect to the residence, and often even conduct by the suspect that demonstrates a tie to the residence.").  Even with an informant, officer may not have such a reasonable belief if

---

[12] The court notes that these cases often implicitly or explicitly apply a presumption that a person is typically at his or her home at certain times of the day.  See, e.g., United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995) ("[O]fficers may presume that a person is at home at certain times of the day . . . ."); United States v. Chavez, 561 F. App'x. 730, 733 (10th Cir. 2014) (listing factors helpful to determine whether an individual is present in his or her home).  This presumption does not apply to this case because 34 Morgan was Dickson's residence, not Bohannon's residence.  See United States v. Werra, 638 F.3d 326, 339 (1st Cir. 2011) (refusing to accept the time of day as a reason to believe someone is present when there is little reason to believe that the person resides there).

the informant is unreliable or unspecific.  See Hardin, 539 F.3d at 421 (officer did not

have a reasonable belief where an informant provided "relatively limited information").

On the other hand, "[d]irect surveillance or actual viewing of the suspect on the

premises is not required."  Valdez v. McPheters, 172 F.3d 1220, 1226 (10th Cir. 1999).

Instead, courts should consider "common sense factors and the totality of the

circumstances to formulate a reasonable belief that a suspect is on the premises."

United States v. Pruitt, 458 F.3d 477, 483 (6th Cir. 2006); see also United States v.

Veal, 453 F.3d 164, 167–68 (3d Cir. 2006).

The government provides the following facts to establish that it had a reasonable

belief that Bohannon was present at 34 Morgan:  (1) at around 2:30 on the morning of

the arrest, SA Zuk received cellular location information suggesting that Bohannon's cell

phone was in an area including 34 Morgan and not including 103 Crestview; (2) this

cellular location information was based on the phone's most recent call at 2:30 a.m.,

which was the phone's last call of the night; (3) officers had once seen Bohannon walk

to the door of 34 Morgan, apparently in mid-October of 2013; (4) more precise cellular

location information[13] had placed Bohannon at or around 34 Morgan on multiple

occasions between September and November of that year; (5) the officers had neither

observed Bohannon at, nor associated him with, any other building or residence within

---

[13] Over the course of the investigation, Bohannon used two phones.  The first phone allowed the
government to track Bohannon's movements more precisely than the second.  The second phone, which
contained older technology, did not allow such precise tracking.  SA Zuk testified that, sometime in
November 2013, Bohannon began to use only the second phone.  Thus, the location information Zuk
received on the night of the arrest was only able to indicate a general area near which Bohannon's phone
had last been used.

the area indicated by the cellular location data;[14] (6) Bohannon had referenced that he was on Morgan Avenue in at least three wiretapped communications, and he appeared to invite a co-defendant in the case to Morgan Avenue on at least one occasion; (7) Bohannon had been pulled over once near Morgan Avenue, and he had told the officer who pulled him over that he had come from Morgan Avenue, explaining that his sister lived there; (8) he was pulled over in a rental car[15] – one not in his name – and he returned the car to the general area of 34 Morgan; (9) the phone that provided the location information had been consistently and exclusively used by Bohannon; (10) there were no cars associated with Bohannon in the area around 103 Crestview; (11) the owner of the second floor apartment in 34 Morgan, Shonsai Dickson, was also the owner of another apartment, 63B Terrace Circle, that was significant in the case as a potential location used to sell heroin; (12) there was a Toyota Camry parked outside of 34 Morgan when the officers arrived.  SA Zuk testified that this Camry was associated with Bohannon because officers had observed it parked outside of 103 Crestview on one occasion, November 26, 2013.  SA Zuk also testified that Shonsai Dickson was associated with Bohannon.  The basis for this association, however, appears to be the officers' observation of the Camry parked at Bohannon's residence on one occasion,

---

[14] However, the significance of this is diminished by the fact that the record contains little evidence of surveillance of Bohannon except the incidents described in (3), (7), and (8).  With such little surveillance, it would have been difficult for the officers to discover any association with another location even if one existed.

[15] It is unclear if this incident is the same as the one just mentioned in (7).

the officers' discovery that the car belonged to Dickson, and the fact that Bohannon had been seen walking to the door of 34 Morgan once before.[16]

The government has the burden and there are significant problems with the government's basis for entering the second floor apartment at 34 Morgan Avenue. First, the area indicated by the cellular phone data in which Bohannon's phone could be is a (relatively) large one.[17]  Indeed, SA Zuk was unable to say how large of an area the cell phone information might encompass.  Although the area indicated by the cellular data did not include Bohannon's residence at 103 Crestview, it did include many other buildings.  While SA Zuk testified that they did not associate Bohannon with any other location within the cellular data's indicated region, that fact does not mean that Bohannon could not have been elsewhere in the area.  Moreover, he could have been driving through any street in the area on his way to his residence at 103 Crestview. Given SA Zuk's testimony that the phone providing the data was used exclusively by Bohannon, it was reasonable for the government to believe that the phone was on his person; however, the location information did not place Bohannon's phone specifically in 34 Morgan, never mind in the second floor apartment of that address.

This first flaw might not have been problematic if the government had established a more convincing connection between Dickson, her Camry, or her apartment and

---

[16]  It is unclear when the officers observed him walking to the door of 34 Morgan.  SA Zuk's testimony suggests that this sighting happened in the middle of October 2013.

[17]  Bohannon argues at some length about the issues involved with SA Zuk's testimony about cellular technology and his reliance on cell phone records.  The court notes that it does not consider SA Zuk to be an expert in cellular technology, and it only considers his testimony to state that he relied upon such records to believe that Bohannon was within a general area.  In any event, the Federal Rules of Evidence generally do not apply to suppression hearings with full force.  See United States v. Raddatz, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial.").

Bohannon.  The officers had only actually seen him walking to the door of 34 Morgan once, and the testimony describing that sighting did not specify whether Bohannon was seen going into the first or second floor apartment.  Moreover, that observation was made more than a month before Bohannon's arrest.  While Bohannon may have mentioned Morgan Avenue in his text messages on several occasions, he never specifically referred to 34 Morgan Avenue itself, its second floor apartment, or Dickson. SA Zuk described Dickson as Bohannon's girlfriend – a title Dickson denied – but he gave no basis for that description.  Despite the fact that that description may have been true, the government provided no basis to believe that fact with evidence it obtained prior to entering 34 Morgan.  Finally, the government saw Dickson's Camry on one occasion at 103 Crestview at the end of November, but they never saw Bohannon driving or in the car.  Nor had they even seen Bohannon driving a car rented in Dickson's name.  While Bohannon was once pulled over in a rental car not in his name, there was no evidence in this record that it was Dickson's rental car.

There are other problems with the government's basis to enter as well.  Notably, the cellular data upon which SA Zuk relied was of questionable accuracy, at least at times.  For example, SA Zuk testified that the GPS data from the first of Bohannon's cell phone, which provided more accurate location information than the second phone, sometimes placed the phone up to 1,500 meters away from its actual location.  That is not to say that the information was never accurate or that it is unhelpful to the officers, but it certainly was not entirely reliable.  Further, the phone that Bohannon was using in December did not even have that capacity, making it less reliable of an indicator of his location.

16

The government entered the second floor apartment at 34 Morgan because SA Zuk believed that Bohannon was likely in the general area and that he was connected to Dickson, the owner of that apartment.  The government's evidence of any connection between Bohannon and Dickson or her apartment is minimal, and it did not give rise to a reasonable belief that Bohannon was present in 34 Morgan at 5:30 a.m. on December 5, 2013.  Therefore, the government's entry into Dickson's apartment was an illegal entry.

        D.     <u>The Exclusionary Rule and the Search Incident to Arrest</u>

Courts apply the exclusionary rule to evidence that is obtained as either a direct or indirect result of an unlawful search or seizure.  <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 484–85 (1963).  Accordingly, where officers enter a residence without a reasonable basis to believe that the subject of an arrest warrant is present, the entry is unlawful and evidence found therein should be suppressed absent some other basis. <u>See</u> <u>Hardin</u>, 539 F.3d at 426 ("[T]he officers' remaining information failed to establish even a reasonable belief that [the defendant] was inside [the apartment].  The search of [the apartment] therefore violated [the defendant's] Fourth Amendment rights, and all evidence obtained as a result—the entirety of evidence in this case—should have been suppressed."); <u>see also</u> <u>United States v. Werra</u>, 638 F.3d 326, 340 (1st Cir. 2011) ("[I]nformation available to the officers was insufficient to support a reasonable belief that Daley would be inside 63 Menlo Street at the time they entered the house.  Hence, the officers' entry into the foyer was unlawful and, because Werra possessed a reasonable expectation of privacy there, the illegal entry violated his Fourth Amendment rights.").

Here, the court has determined that Bohannon had a privacy interest in Dickson's bedroom and that the officers did not have a reason to believe that Bohannon was inside Dickson's apartment at the time they entered.  Therefore, the evidence obtained during the officers' search incident to Bohannon's arrest must be suppressed.

The officers stated reason for looking around Bohannon, including under the bed next to which he was standing and in the pockets of his pants,[18] was for their own protection.  This is understandable, especially given that the officers were aware of Bohannon's association with violence.  However, as the First Circuit noted in Werra, "the reasonableness of the officers' interaction with such an individual for that protective purpose does not determine the Fourth Amendment suppression issue generated by the unlawful entry."  638 F.3d at 341.

E.  Dickson's Consent

While the unlawfulness of the government's entry requires suppression of the evidence found during the search incident to Bohannon's arrest, it does not necessarily require suppression of the evidence found during the officers' search based on Dickson's consent.  The validity of Dickson's consent to search requires two separate but overlapping inquiries.  First, the court must determine whether the illegal entry had tainted Dickson's consent and, if so, whether that taint had dissipated between the time of the illegal entry and the time that Dickson gave her consent.  Second, the court must determine whether Dickson's consent was otherwise voluntary.  In order for Dickson's

---

[18] The court cannot conclude that the money found in the pockets of Bohannon's pants would have been inevitably discovered pursuant to an inventory search.  Such an exception to the exclusionary rule requires that the government show, among other things, that the officers would have conducted an inventory search "pursuant to 'established' or 'standardized' procedures."  United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002).  The record before the court contains no such evidence.

consent to be valid, any taint must have dissipated and her consent must have been voluntary.

i.   Dickson's Consent Was Tainted by Illegal Entry and Search

Bohannon argues that Dickson's consent was tainted by the government's illegal actions and that the taint had not dissipated. "When consent to search follows an illegal entry, [the Second Circuit] requires the government to show more than the voluntariness of consent; it must also demonstrate that 'the taint of the initial entry has been dissipated' in order to admit evidence seized following the illegal entry." United States v. Snype, 441 F.3d 119, 132 (2d Cir. 2006) (quoting United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990); see also United States v. Murphy, 703 F.3d 182, 190 (2d Cir. 2012) ("When consent to search is preceded by an unlawful government seizure, the evidence obtained from the search must ordinarily be suppressed unless the Government shows both that the consent was voluntary *and* that the taint of the initial seizure has dissipated." (internal quotation marks and brackets omitted)); United States v. Tortorello, 533 F.2d 809, 815 (2d Cir. 1976) ("[T]he procurement of a 'voluntary' consent to search based upon a prior illegal search may taint the consent.").

Courts consider four factors in determining whether the taint of prior illegal action has dissipated: (1) whether Miranda warnings were given; (2) the amount of time that passed between the illegal act and the consent; (3) the presence of any intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. Oguns, 921 F.2d at 447. Regarding the second factor, "intervening events, even within a brief time, can sometimes sever the casual connection between an illegal entry and subsequent consent to search, thereby permitting a court to conclude that the consent

fairly reflects an act of free will." <u>Snype</u>, 441 F.3d at 135.  Significant "intervening circumstances" include kind treatment by the present officers and a calming of the environment, <u>see id.</u>; the readiness with which consent is given, <u>see</u> <u>United States v. Moreno</u>, 701 F.3d 64, 81 (2d Cir. 2012) (Carney, J., concurring) <u>cert. denied,</u> 133 S. Ct. 2797, 186 L. Ed. 2d 864 (2013); and the reading and signing of a consent form, <u>see</u> <u>Oguns</u>, 921 F.2d at 447–48.  Finally, regarding the fourth factor, the Second Circuit has approvingly noted that some of its "sister circuits have held that purposeful and flagrant police conduct exists where (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." <u>Murphy</u>, 703 F.3d at 192 (internal quotation marks omitted).

Notably, while Dickson gave two consents over the course of the morning – her consent to search her apartment and her later consent to search the cars – Bohannon can only assert a violation of his Fourth Amendment rights with respect to the search of the apartment.  <u>See</u> <u>supra</u> Section III.A., at 7–9.  Regarding the first factor, it is undisputed that the officers informed Dickson of her <u>Miranda</u> rights; Dickson signed a form that stated these rights and acknowledged her willingness to speak without a lawyer.  Def.'s Ex. 102.  Dickson's <u>Miranda</u> form indicates that it was signed at "0715," presumably meaning 7:15 a.m.  <u>Id.</u>  The consent to search was given by Dickson soon after Bohannon's arrest, which happened at about the same time that Bohannon signed his <u>Miranda</u> form.  As a point of reference, Bohannon signed his <u>Miranda</u> form at 6:21 a.m., <u>see</u> Gov't Ex. 19, nearly an hour before Dickson signed her <u>Miranda</u> form.  The

court finds that Dickson was informed of her rights <u>after</u> her consent to search the apartment.

Regarding the second factor, Dickson's consent to search her apartment was given soon after the illegal entry of several officers. SA James was waiting at the front door for about eight minutes, and he was only in the bedroom for a minute or so before both Dickson and Bohannon had been removed. SA James testified that he sought consent from Dickson a few minutes after Bohannon was read his <u>Miranda</u> rights. Based on this, Dickson seemed to have given her consent within fifteen minutes of the initial entry, and within a shorter amount of time of SA James's entry and the discovery of the crack cocaine. Perhaps even more importantly, her consent was given virtually immediately after she learned that the crack cocaine had been found.

Intervening events, the third factor, cut both ways. It is undisputed that the officers were kind to Dickson and allowed her time in her bathroom to brush her teeth before obtaining her consent. However, after the initial illegal entry by Detectives Ortiz and Scholl, Dickson was likely further frightened by the entry of additional officers. Indeed, her testimony made clear that she felt her apartment was swarming with officers. She was nervous and crying at or around the time she gave the consent. While Dickson did not resist giving her consent and signing a consent form, this fact does not strongly weigh in either direction because that consent was given so soon after the illegal entry and discovery of drugs under her bed. Perhaps most importantly, the taint of the illegal entry was further heightened by the officers' act of informing her that they had already found crack cocaine under Dickson's bed. Not only did the officers inform her of the fact that drugs were found, but they indicated to her that they would be

able to obtain a search warrant, and they told her that she and her sister could be arrested based on the drugs they found.[19]  Significantly, she testified that her refusal to give them consent would be a waste of time because the officers would simply obtain a search warrant.  While this aspect of the taint may have been minimized by the fact that Bohannon shouted his confession that all of the contraband was his, his confession was unlikely to outweigh the fear she felt for herself and her sister.  Presumably, Dickson would have already known that the drugs belonged to Bohannon, and she may have thought she and her sister were subject to arrest no matter who owned the drugs.

With respect to the last factor, the government did not engage in intentionally or recklessly unconstitutional behavior.  The government's conduct was not a speculative scheme to find evidence that may exist.  As the government pointed out at oral argument after the evidentiary hearing, the officers did not initially search the open closet near Bohannon in which the guns were eventually found.  Further, although the court did not decide the issue because of the illegality of the initial entry, there are good reasons to believe that the officers' search under the bed incident to Bohannon's arrest would have been valid as a protective search, but for that illegal entry.

Based on these factors, the court concludes that the taint over Dickson's consent to the apartment search had not dissipated.  She gave this consent soon after a number of officers illegally entered her apartment, informed her that illegal drugs were found in her apartment, and threatened her and her sister with arrest.

---

[19] As the court noted in footnote 5, supra, SA James only testified to informing Dickson that she could be arrested based on what was found, but other officers were present with Dickson.  The court credits Dickson's testimony and finds that one of the other officers told her about their ability to obtain a search warrant and to arrest her sister.

ii.     Dickson's Consent Was Not Voluntary

Even if any taint had dissipated, Dickson's consent was not voluntary.  "Whether an individual has consented to a search is a question of fact to be determined by the totality of all the circumstances.  Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority."  United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993) (internal quotation marks and citations omitted).  "The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to search."  United States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2004) (internal quotation marks and brackets omitted).  Courts in the Second Circuit consider a number of factors in determining whether consent was voluntarily given.  These include: (1) the age of the consenter; (2) her educational background; (3) her intelligence; (4) the use of physical punishments or deprivations; (5) whether she was advised of her constitutional rights; (6) whether the consenter was in custody; (7) whether guns were drawn; (8) whether the consenter was frisked; (9) whether the consenter was threatened; (10) whether she was in a public area; and (11) whether she was informed that she had the option of refusing consent.  See United States v. Puglisi, 790 F.2d 240, 243–44 (2d Cir. 1986).

Again, while Dickson gave two consents to search, the court only analyzes the one relating to her apartment because Bohannon cannot challenge the search of the Toyota Camry.  Some of above-listed factors support a finding that Dickson gave consent voluntarily.  Dickson has a bachelor's degree in Criminal Justice.  Indeed, when the officers explained to her their ability to search under the "arm's length rule" – apparently referring to a protective search – she told them that she was aware of the

23

rule.  Dickson holds two jobs.  These facts are important in themselves, and they also provide some indication of Dickson's intelligence.  While no statement was made on the record as to her age,[20] Dickson's demeanor, along with her work and educational history, suggest that she is not so young as to be easily taken advantage of.  There is no evidence that the officers were physical with Dickson.  To the contrary, Dickson testified that the officers treated her nicely; they even let her go to the bathroom unaccompanied so that she could brush her teeth.  The officers never had their guns drawn.[21]  Dickson was not handcuffed or arrested.  There is no evidence suggesting that Dickson was frisked.  SA James testified that Dickson readily gave verbal consent to search.  Finally, Dickson signed a consent-to-search form after she read it to herself, and the officers read it to her out loud.  See Gov. Ex. 4.  The form stated that she had been advised of her right to refuse consent.  Id.

Other considerations, however, weigh against the voluntariness of her consent. For example, while officers did administered her Miranda rights, and Dickson signed a form acknowledging that she had been informed of those rights and that she was willing to talk without a lawyer present, Def.'s Ex. 102, this happened only after she gave consent for the apartment search.  There were also many officers in her apartment, and Dickson's testimony made it clear that she was aware of their presence and fearful.

---

[20] The government states that Dickson was a day short of 24 years old on December 5, 2013, the date of the incident.  Gov. Resp. Supp. (Doc. No. 397) at 13.

[21] At one point during the hearing, Dickson seemed unsure of whether the officers had their guns drawn when they first entered her room.  However, she seemed confused about the question and instead suggested that the officers simply had guns on them.  In any case, her testimony made clear that she did not feel threatened by guns, and the officers' testimony was that they had not drawn their guns.

There are two more troubling aspects relating to Dickson's consent to search her apartment.  First, Dickson was threatened in the sense that the officers informed her that she and her sister could be arrested based on the drugs they found.  Second, Dickson testified that the officers told her they could obtain a search warrant if she refused consent.

At least one district court in the Second Circuit has held "a police threat to arrest a suspect's loved ones undermines the voluntariness of consent where the police lack probable cause to make such arrests."  United States v. Munoz, 987 F. Supp. 2d 438, 447 (S.D.N.Y. 2013).  Further, the Second Circuit in United States v. Vasquez, 638 F.2d 507 (2d Cir. 1980), "expressed reservation as to whether a consent would . . . be[ ] upheld if [law enforcement officers] . . . allowed [a] defendant to base his consent on the mistaken belief that a warrant could be obtained."  Id. at 529; compare United States v. Calvente, 722 F.2d 1019, 1024 (2d Cir. 1983) (stating that truthfully informing a property owner that a search warrant could be obtained does not vitiate consent).  Based on the language in Vasquez, a court in the Southern District of New York has stated that "consent obtained based on a false representation that the police could secure a search warrant is involuntary."  Munoz, 987 F. Supp. 2d at 445 & n.59 (citing United States v. Cruz, 701 F. Supp. 440, 447 (S.D.N.Y. 1988)).  While this court declines to adopt the "reservation" in Vasquez as a blanket prohibition on finding consent, it instead considers the officers' statements as very significant factors to consider in the totality of the circumstances.

Of course, the degree to which the officers' statements had a detrimental effect on the voluntariness of Dickson's consent depends, at least in part, on whether the

statements were true or not, i.e., whether the officers would have been able to obtain a search warrant and whether the drugs provided the officers with evidence to arrest Dickson or her sister.  See Munoz, 987 F. Supp. 2d at 447; see also Vasquez, 638 F.2d at 529.  The court concludes that, under Steagald v. United States, 451 U.S. 204 (1981), the officers' statements about their ability to obtain a search warrant or their ability to arrest Dickson were untrue.

In Steagald, the United States Supreme Court stated that, "while [an arrest warrant] . . . may . . . protect [the subject of the arrest warrant] from an unreasonable seizure, it [does] absolutely nothing to protect [a third party homeowner's] privacy interest in being free from an unreasonable invasion and search of his home."  Id. at 215.  The Court further noted that an arrest warrant for one individual:

> embodies no judicial determination whatsoever regarding the person whose home is to be searched.  Because it does not authorize the police to deprive the third person of his liberty, it cannot embody any derivative authority to deprive this person of his interest in the privacy of his home. Such a deprivation must instead be based on an independent showing that a legitimate object of a search is located in the third party's home.

Id. at 214 n.7.  The Second Circuit has summarized  Steagald as ruling "that a search warrant [is] necessary to protect the privacy interests of a third party whose home was searched for the subject of an arrest warrant."  United States v. Snype, 441 F.3d 119, 134 (2d Cir. 2006).

Here, the officers' statements to Dickson directly implicate the Supreme Court's concern in Steagald: the unreasonable invasion of a third party homeowner's privacy interest in her home based on an arrest warrant for another individual.  It is undisputed that the officers' entry into Dickson's house was based solely on the arrest warrant for Bohannon: the officers did not have a search warrant for 34 Morgan Avenue.  Moreover,

26

the court has determined that the officers did not have a reasonable basis to believe that Bohannon was present in Dickson's apartment.  See supra Part III.C.  Thus, the officers' entry into the apartment was illegal, and their subsequent discovery of drugs under the bed was a fruit of that unlawful entry.  See supra Part III.D.  The officers' statements indicating that they would be able to obtain a search warrant and that Dickson or her sister could be arrested were based entirely on evidence that was unlawfully obtained.

The officers' threat that she and her sister could or would be arrested based on the drugs they discovered, along with their statements that they would be able to obtain a search warrant based on that evidence, overcomes those factors that indicate voluntary consent.  Dickson simply could not have given voluntary consent when her decision was informed by an incorrect threat of arrest and statements making it seem to her that a search of her apartment was inevitable.  This case is unlike United States v. Kon Yu-Leung, 910 F.2d 33, 41 (2d Cir. 1990), which the government cites, Gov't Resp. 14, because Dickson was not a "former experienced police officer" striking a deal with the arresting agents.  See United States v. Yu-Leung, 51 F.3d 1116, 1119 (2d Cir. 1995) (quoting and affirming the district court's finding of a voluntary consent).  Instead, Dickson made a decision based on threats improperly stating that she and her sister could be arrested and that the officers would obtain a search warrant.

G.      The Exclusionary Rule Applies

Finally, the government argues that, "[e]ven if there was some defect in executing the arrest warrant at 34 Morgan Avenue, the Court should not exclude the evidence seized from Dickson's residence" based on Herring v. United States, 555 U.S.

135 (2009).  Gov't Resp. 14.  In <u>Herring</u>, the Supreme Court explained that the "fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies."  <u>Id.</u> at 140.  Instead, the exclusionary rule "applies only where it results in appreciable deterrence."  <u>Id.</u> at 141 (internal quotation marks and brackets omitted).  The court stated that its "cases require any deterrence to be weighed against the substantial costs exacted by the exclusionary rule."  <u>Id.</u> at 144 n.4.  The Court noted that it had not applied the exclusionary rule to evidence obtained by officers who reasonably relied on a warrant, <u>id.</u> at 142 (citing <u>United States v. Leon</u>, 468 U.S. 897, 922 (1984)), and it held that the exclusionary rule did not apply where an officer had a reasonable belief that there was an outstanding arrest warrant for an individual, despite the fact that that belief turned out to be wrong because of the negligent bookkeeping of another police employee.  <u>See id.</u> at 137.

    <u>Herring</u> does not control this case.  In <u>Herring</u>, the officer wrongfully effectuated an arrest based on a negligent bookkeeping error.  <u>Id.</u>  Here, the officers entered into a third party residence to arrest the subject of an arrest warrant without a reasonable basis to believe that he was on the premises.  The officers then obtained the third party's consent to search the apartment by informing her that evidence found incident to the arrest could provide a basis for her and her sister to be arrested and for a search warrant to be obtained.  These were deliberate choices capable of being deterred.  More importantly, they ought to be deterred because of their potential for abuse.

    Indeed, the facts of this case demonstrate the potential for police abuse.  First, because of the illegal entry, the threats were false.  Further, SA Zuk testified that Dickson owned another apartment that officers believed was being used to sell heroin in

28

connection with this case.  Officers may have wanted to enter and search Dickson's apartment, but lacked sufficient reason to do so.  They may have viewed Bohannon's arrest in that apartment as a potential way for them to do just that.  The court does not conclude that this was actually SA Zuk's intention.  However, this type of abuse is conceivable, and it ought to be deterred by the exclusionary rule.  Cf. Herring, 555 U.S. at 141 ("[W]e have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future.").

## IV.     CONCLUSION

For the foregoing reasons, Bohannon's Motion to Suppress Evidence (Doc. No. 134) is GRANTED in part and DENIED in part.  The court grants the Motion as to the evidence found in Dickson's apartment.  The court denies the Motion as to the evidence seized in Dickson's car.

**SO ORDERED.**

Dated at New Haven, Connecticut, this 15th day of December, 2014.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge