**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 13–CR–229 (JCH) |
| | : | |
| JONATHAN BOHANNON, | : | APRIL 28, 2017 |
| Defendant. | : | |

**RULING RE: GOVERNMENT'S MOTION FOR RECONSIDERATION (DOC. NO. 704)**

## I.    INTRODUCTION

Shortly after defendant Jonathan Bohannon ("Bohannon") filed a Motion asking

this court to reconsider its Ruling ("Suppression Ruling") (Doc. No. 432)[1] granting in part

and denying in part his Motion to Suppress Evidence (Doc. No. 134), see generally

Def., Jonathan Bohannon's Mot. to Reconsider Suppression of Evid. (Doc. No. 699), the

government filed its own Motion asking this court to reconsider the Suppression Ruling,

see generally Govt.'s Mot. for Recons. ("Motion") (Doc. No. 704).  Although the court

has denied Bohannon's Motion to Reconsider, see Ruling ("First Recons. Ruling" or

"First Reconsideration Ruling") (Doc. No. 717), the government's Motion is currently

pending.  At issue in the government's Motion are two aspects of the court's

Suppression Ruling on which the Second Circuit, see generally United States v.

Bohannon, 824 F.3d 242 (2d Cir. 2016),[2] did not specifically opine: (1) whether money

found in Bohannon's pants pockets and drugs found under the bed in the room in which

_____

[1] The Suppression Ruling is also available at 67 F. Supp. 3d 536.  Throughout this Ruling, citations to the Suppression Ruling will refer to the pagination in the version at Docket Number 432, rather than to the Federal Supplement.

[2] The Second Circuit's Opinion is also appended to the Mandate issued in this case, available at Docket Number 711.  For ease of reference, the court will cite, as the parties do, to the Federal Reporter, rather than to the Opinion as appearing in Docket Number 711.

he was arrested are admissible; and (2) whether firearms, ammunition, drugs, a scale, and cash discovered after the resident of the apartment gave consent to search are admissible. The court heard oral argument on the Motion on April 24, 2017. See Minute Entry (Doc. No. 730).

For the reasons set forth below, the Motion for Reconsideration is **GRANTED**.

On reconsideration, the court **GRANTS IN PART AND DENIES IN PART** the portions of Bohannon's original Motion to Suppress Evidence (Doc. No. 134) reconsidered in this Ruling.

## II.     BACKGROUND

### A.     Facts

This court conducted an evidentiary hearing on Bohannon's Motion to Suppress on November 13, 2014. See Minute Entry (Doc. No. 373). In its Suppression Ruling, the court articulated the facts, as developed at the evidentiary hearing, relevant to ruling on the Motion to Suppress. See Suppression Ruling at 3 n.4 ("To the extent that there was conflicting testimony, the court resolves those conflicts as stated . . . ."); see also United States v. Bohannon, 824 F.3d 242, 245 n.1 (reporting facts as "developed at [the] suppression hearing before the district court"). The court's description of the facts was not at issue on appeal, nor are the facts as found directly at issue in the government's Motion. Rather, the Motion asks the court to draw different legal conclusions from those facts. As such, the recitation of the events of December 5, 2013, set forth below, is drawn from the court's Suppression Ruling and limited to the facts necessary to rule on the pending Motion.

A group of federal and local law enforcement officers arrived at Shonsai Dickson's apartment at 34 Morgan Avenue ("34 Morgan"), in Bridgeport, Connecticut, in the early morning hours of December 5, 2013. See Suppression Ruling at 2–3. Attempting to execute an arrest warrant issued by Magistrate Judge Holly B. Fitzsimmons, see Arrest Warrant (Doc. No. 3), the officers believed that Bohannon was at Dickson's apartment based, in part, on location information related to Bohannon's cell phone, see Suppression Ruling at 2–3. Special Agent ("SA") Ryan James and other officers knocked and announced their presence at the front door, while Bridgeport Police Detectives Paul Ortiz and Thomas Scholl proceeded to the back door of Dickson's second-floor apartment. Id. at 3. After knocking and receiving no response, Detectives Ortiz and Scholl opened the unlocked door and entered the apartment. Id. At around this time,

> Dickson awoke to her sister [who also lived at 34 Morgan] informing her that someone was knocking on the front door. Two officers then entered the apartment into the kitchen, where they saw Dickson briefly before she entered another room. The officers followed Dickson into what turned out to be a bedroom, where they saw Bohannon lying in a bed. Dickson stood next to the bed on the side closer to the doorway, and Bohannon was lying on the side of [the] bed closer to the window. The officers stated that they had a warrant for Bohannon's arrest. Bohannon stood up next to his side of the bed, where he was next to the windows and a closet. The officers then approached Bohannon's side of the bed, looked around quickly, and began placing Bohannon under arrest. Before Bohannon was handcuffed, Detective Ortiz left the bedroom and walked to the front door, which he opened for the rest of the arrest team to enter.

> SA James and the other agents had waited for about eight minutes at the front door before Detective Ortiz let them in the apartment. The arrest team entered the bedroom to find Dickson standing on one side of the bed and Bohannon on the other. Officer Scholl stood near Bohannon, but he had not yet handcuffed him. SA James testified that, as he and Task Force Officer ("TFO") Jason Guerrara approached Bohannon and Officer Scholl, Officer Scholl indicated to him to look under the bed. As SA James held Bohannon and TFO Guerrara put him in handcuffs, SA James looked under the bed and saw bags containing white powder. He identified the substance as crack cocaine.

Id. at 3–4 (footnotes omitted). As the officers arrested Bohannon, they allowed Bohannon to put on a pair of pants, but before doing so searched the pants and found a significant sum of money in a pocket. Id. at 5.

Bohannon was handcuffed and brought into the kitchen, as Dickson was moved to the dining room. Id. "Dickson testified that the officers were kind to her," as they allowed her to brush her teeth in the bathroom without supervision from any of the officers. Id. The officers told Dickson—who majored in criminal justice in college—that they had found crack cocaine while performing an "arms-length" search, in Dickson's terminology. Id. Dickson understood, to some extent, that officers could conduct certain limited searches incident to arrest. Id. The officers told Dickson that she and her sister—who also lived in the apartment—could be arrested based on the drugs that the officers had already found. Id. Dickson became upset, and Bohannon shouted from the kitchen that everything was his. Id. Then, the officers asked for Dickson's consent to search the apartment, claiming that they would obtain a search warrant if she did not consent. Id. Dickson orally consented and, after reading a form to herself and having the officers read it aloud, signed the form indicating her consent. Id. at 5–6.[3]

While searching Dickson's apartment, officers found guns and ammunition in the bedroom closet next to which Bohannon had slept. They also found crack cocaine, a digital scale, and cash in a dresser drawer in the bedroom. Id. at 6.

---

[3] Details regarding the officers' search of Dickson's car are not relevant to this Ruling and are not recounted above. For such details, see generally the Suppression Ruling and First Reconsideration Ruling.

B.      Procedural History

As noted above, Magistrate Judge Holly B. Fitzsimmons issued an arrest warrant, see generally Arrest Warrant (Doc. No. 3), after the filing of a Criminal Complaint, see generally Criminal Compl. (Doc. No. 1), against Bohannon.  Shortly thereafter, a federal grand jury indicted Bohannon and thirteen codefendants.  See generally Indictment (Doc. No. 14).  The Indictment charged Bohannon with (1) conspiracy to distribute and to possess with intent to distribute narcotics (Count One), see id. ¶¶ 1–7; (2) possession with intent to distribute cocaine base (Count Five), see id. ¶ 11; (3) possession of firearms and ammunition by a convicted felon (Count Fifteen), see id. ¶ 21; and (4) possession of firearms in furtherance of drug trafficking crimes (Count Sixteen), see id. ¶ 22.

Most relevantly for the purposes of this Ruling, Bohannon filed a suppression motion on June 6, 2014, see generally Mot. to Suppress Evid. (Doc. No. 134); Suppl. Mem. in Supp. of Mot. to Suppress Evid. (Doc. No. 362), to which the government objected, see generally Govt.'s Resp. to Def.'s Mot. for Return of Property (Doc. No. 144); Govt.'s Response to Def.'s Suppl. Mot. to Suppress Evid. (Doc. No. 397). After an evidentiary hearing on November 13, 2014, see Minute Entry (Doc. No. 373), the court granted in part and denied in part Bohannon's suppression motion, see Suppression Ruling at 1.  Specifically, the court ruled: (1) that Bohannon had a privacy interest in the apartment, but not in Dickson's Toyota Camry, see Suppression Ruling at 8–9; (2) that the government was not required to obtain a search warrant before arresting Bohannon in Dickson's home, see id. at 11; (3) that the government did not have a reasonable belief that Bohannon was in Dickson's apartment, and so their entry

therein was unlawful, see id. at 11, 17; (4) that, because of the officers' unlawful entry, evidence derived from the search incident to arrest must be excluded, see id. at 17–18; (5) Dickson's consent to search her apartment was tainted by the illegal entry, see id. at 19–22; (6) Dickson's consent was not voluntary, even if any taint had dissipated, see id. at 23–27; and (7) the exclusionary rule prohibited admission of evidence derived from the search to which Dickson consented, see id. at 27–29.

Pursuant to section 3731 of title 18 of the United States Code, the government filed a timely interlocutory appeal from this court's Suppression Ruling, "challenging only the suppression of the crack cocaine found under Dickson's bed and the cash found in Bohannon's pants pocket incident to his arrest." See United States v. Bohannon, 824 F.3d 242, 247 (2d Cir. 2016). Notably, "[t]he government [did] not challenge the suppression of other evidence found in the subsequent search that the district court ruled was not supported by voluntary consent." Id. at 247 n.6. The Second Circuit opined that "because the law enforcement officers who entered Dickson's apartment on December 5, 2013, possessed both a valid warrant for Bohannon's arrest and reason to believe that he was then in those premises, Bohannon fails to demonstrate that his arrest violated the Fourth Amendment." Id. at 257. Thus, the Circuit vacated this court's order suppressing "any evidence seized incident to arrest on the ground that officers lacked the requisite reasonable belief of presence necessary to Bohannon's lawful arrest . . . ." Id. at 258. The Circuit did not address the lawfulness of the "contemporaneous search of [Bohannon's] pants pockets and seizure of money therefrom" or the "contemporaneous search under Dickson's bed and later seizure of

drugs seen thereunder," leaving those determinations for this court on remand.  See id.
at 258 n.15.

The government has now filed the pending Motion, asking the court to reconsider
its conclusions in the Suppression Ruling that the drugs under the bed in Dickson's
apartment and money in Bohannon's pockets are inadmissible, see Motion at 10–12, as
well as its determination that the guns, ammunition, drugs, and scale found during the
consent search were unlawfully obtained and should be excluded, see id. at 12–22.
Bohannon concedes that the money in Bohannon's pants pocket is admissible, see
Mem. in Reply to Govt.'s Mot. for Recons. ("Opposition" or "Opp'n") (Doc. No. 706) at 1,
but maintains his dispute as to the admissibility of the other pieces of evidence, see
Opp'n at 1, 7–8, 25.[4]

## III.   DISCUSSION

The evidence at issue in this Motion is best divided into three categories: (1) the
money found in Bohannon's pants pocket; (2) the drugs under the bed in Dickson's
apartment; and (3) the firearms, ammunition, drugs, scale, and cash discovered after
Dickson consented to a search of her apartment.  However, before the court revisits the
merits of its earlier exclusion of this evidence, it must determine whether
reconsideration is appropriate.

### A.   Timeliness of Motion for Reconsideration

As the court recently noted, see First Recons. Ruling at 3–6, parties must file
motions for reconsideration within seven days of the entry of the ruling of which

_____

[4] Bohannon's recently-appointed counsel has filed a Supplemental Opposition to the
government's Motion.  See generally Suppl. Mem. of Law re: Def.'s Obj. to Govt.'s Mot. for Recons.
("Supplemental Opposition" or "Suppl. Opp'n") (Doc. No. 727).

reconsideration is sought, see D. Conn. Crim. R. 1(c) (noting applicability of D. Conn. Civ. R. 7(c) in criminal proceedings); D. Conn. Civ. R. 7(c)(1) ("[Motions for Reconsideration] shall be filed and served within seven (7) days of the filing of the decision or order from which such relief is sought . . . .").[5]

Bohannon concedes that the government's Motion is timely, insofar as it seeks reconsideration of the admissibility of the money found in Bohannon's pants pocket and the drugs under the bed in Dickson's bedroom. See Opp'n at 8 n.4 ("The government could not request this Court to reconsider the evidence under a search incident to a lawful arrest theory until the Second Circuit overturned this Court's suppression order."). However, he disputes the timeliness of the government's request that the court reconsider the voluntariness of Dickson's consent to search her home. See Opp'n at 7–8 & n.4.

As a preliminary matter, the court agrees with Bohannon's concession that the government could not have moved for reconsideration of the exclusion of the evidence found in Bohannon's pocket and under Dickson's bed before the Second Circuit's ruling. Cf. United States v. Bohannon, 824 F.3d 242, 258 n.15 ("The district court did not itself consider whether these seizures [of the money in Bohannon's pants and the drugs under Dickson's bed] were properly deemed 'incident' to a lawful arrest, having mistakenly concluded that Payton error rendered Bohannon's arrest (and any search incident thereto) unlawful. Thus, we leave that question for its consideration on

---

[5] For the purposes of this Ruling, it does not matter whether analysis of the Motion for Reconsideration's timeliness looks to the current version of the Local Rules or to prior versions that allowed for fourteen days. In either case, the time for filing a motion for reconsideration has long since passed.

remand."). Therefore, the Motion for Reconsideration is granted as to the money in Bohannon's pants and the drugs under Dickson's bed.

Next, the court turns to Bohannon's argument that the government's request for reconsideration of the admissibility of the guns, ammunition, drugs, scale, and money found after receiving Dickson's consent to search her apartment is untimely. Bohannon fairly notes, as did the Second Circuit, see Bohannon, 824 F.3d at 247 n.6, that the government did not challenge on appeal this court's ruling that Dickson's consent was involuntary, see Opp'n at 7. Nor did the government file a Motion for Reconsideration in the immediate aftermath of the issuance of this court's Suppression Ruling. See Opp'n at 7.

Though sympathetic to Bohannon's arguments, the court believes that reconsideration is prudent here. Admittedly, over two years passed from the date the court issued its Suppression Ruling until the government filed its Motion for Reconsideration. However, the Second Circuit's holding that the law enforcement officers' entry into Dickson's apartment was lawful alters the lens through which this court views the voluntariness of Dickson's consent, just as it alters the way the court views the admissibility of the money in Bohannon's pants and the drugs under Dickson's bed.

Crucially, this court concluded that Dickson's consent was involuntary based in large part on the officers' statements that Dickson and/or her sister could be arrested and that the officers could obtain a search warrant if Dickson refused to consent to the search. See Suppression Ruling at 23–27. As the court noted in the Suppression Ruling, "the degree to which the officers' statements had a detrimental effect on the

voluntariness of Dickson's consent depends, at least in part, on whether the statements were true or not, i.e., whether the officers would have been able to obtain a search warrant and whether the drugs provided the officers with evidence to arrest Dickson or her sister." See id. at 25–26 (citing, inter alia, United States v. Munoz, 987 F. Supp. 2d 438, 447 (S.D.N.Y. 2013)). Though there remains a dispute as to whether the officers could have obtained a search warrant, compare Motion at 16–17, with Opp'n at 20–23, there is no doubt that the basis for the answer to that question is significantly altered by the Circuit's determination that the officers' entry to arrest Bohannon was lawful. As such, the analysis of Bohannon's claim that the evidence derived from the consent search should be suppressed has changed, cf. D. Conn. Crim. R. 1(c) (noting applicability of D. Conn. Civ. R. 7(b) in criminal proceedings); D. Conn. Civ. R. 7(b)(1) (permitting court to extend deadlines on showing of good cause), and reconsideration of whether Dickson's consent was voluntary is appropriate. Therefore, the Motion for Reconsideration is granted as to the evidence discovered after Dickson consented to the search of her apartment.

Thus, the court will reconsider the admissibility of each of the three categories of evidence that it initially excluded: (1) the money found in Bohannon's pants pocket; (2) the drugs under Dickson's bed; and (3) the evidence derived from the consented-to search of Dickson's apartment.

B.    Money in Bohannon's Pants Pocket

In the Suppression Ruling, the court ruled that the money found in Bohannon's pants pocket must be suppressed, because the law enforcement officers' entry into Dickson's apartment was unlawful. See Suppression Ruling at 18. The Second

Circuit's opinion made clear that, because the officers had a reason to believe Bohannon was at 34 Morgan, their entry into Dickson's apartment was lawful.  See Bohannon, 824 F.3d at 253, 257–58.  The parties now agree that the money found in and seized from Bohannon's pants pocket is admissible.  See Motion at 12; Opp'n at 1, 7.  The court also agrees.  See United States v. Robinson, 414 U.S. 218, 224 ("It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. . . . [A] search may be made of the area within the control of the arrestee."); Suppression Ruling at 18 ("The officers['] stated reason for looking around Bohannon, including under the bed next to which he was standing and in the pockets of his pants, was for their own protection.  This is understandable, especially given that the officers were aware of Bohannon's association with violence.").

Thus, on reconsideration, the court concludes that the money in Bohannon's pants pocket is admissible.

C.    Drugs Under Dickson's Bed

Next, the court turns to the government's suggestion that the court reconsider its earlier suppression of the drugs seized from under Dickson's bed.  The government argues that the search by which the officers saw the drugs was permissible both as a protective sweep, see Motion at 10–11 (citing inter alia, Maryland v. Buie, 494 U.S. 325, 334 (1990)), and as a search of an "area within [Bohannon's] immediate control," see Motion at 10–12.  Bohannon counters that the officers had no reason to look under the bed out of fear that he might grab something, because he was "handcuffed within 'seconds'" of the officers' entry into Dickson's bedroom, and he was guarded by two officers who prevented him from reaching under the bed.  See Opp'n at 5–6.  At oral

argument on the Motion, held on April 24, 2017, Bohannon appeared also to suggest that the drugs could not be seized because the officers were not looking for drugs when they searched under the bed (however that search is best categorized), but instead for dangerous people or objects.

The court will address the permissibility of the search, first as a search of the area within Bohannon's immediate control and, second, as a protective sweep.

### 1. Search of Area in Bohannon's Immediate Control

"[I]f an officer reasonably concludes that an individual poses a danger to those at the scene of the arrest, the threat of physical harm may be neutralized by a quick search for weapons within the reach of that individual." United States v. Blue, 78 F.3d 56, 58 (2d Cir. 1996) (citing United States v. Hernandez, 941 F.2d 133, 137 (2d Cir. 1991)). The Second Circuit has grounded the permissibility of such a search in officers' need to "neutralize the threat of physical harm by determining whether there [are] weapons within [the defendant's] reach." Hernandez, 941 F.2d at 137 (quotation marks and citations omitted). Indeed, the Supreme Court has concluded that "[t]here is ample justification . . . for a search of the . . . area 'within [the arrestee's] immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible device." Chimel v. California, 395 U.S. 752, 763 (1969), abrogated on other grounds by Arizona v. Gant, 556 U.S. 332 (2009).

Here, the court concluded in the Suppression Ruling that "[a]s SA James held Bohannon and TFO Guerrera put him in handcuffs, SA James looked under the bed and saw bags containing white powder." Suppression Ruling at 4 (emphasis added). Notably, SA James testified at the Suppression Hearing that he looked under the bed at

the direction of Detective Scholl.  See Suppression Hr'g Tr. (Doc. No. 411) at 128:24–

129:6.  This instruction from Detective Scholl leads the court to conclude that, while he

was the only officer in the bedroom with an un-handcuffed Bohannon, Detective Scholl

briefly looked at the area underneath the edge of Dickson's bed.  Indeed, at the recent

oral argument on April 24, 2017, Bohannon conceded that the officers looked under the

bed as or before he was handcuffed.  Multiple law enforcement officers testified at the

November 2014 Suppression Hearing that they were aware of allegations that

Bohannon had engaged in violent conduct in the past, see id. at 17:8–17:18 (Zuk),

93:18–93:23 (Ortiz), 123:16–123:21 (James), and looked under the bed in order to

ensure their own safety, see id. at 109:8–109:18, 121:23–122:3 (James); see also

Suppression Ruling at 18 (characterizing as "understandable" the officers' "stated

reason for looking around Bohannon"—namely, "for their own protection"—given their

"aware[ness] of Bohannon's association with violence").  The court thus concludes that

the reasonable officer would have been sufficiently concerned for his physical safety, as

Detective Scholl was, to justify a brief search for weapons in reach under Dickson's bed.

The cases Bohannon cites to the contrary are readily distinguishable.  First,

Bohannon suggests that, in United States v. Mapp, 467 F.2d 67 (2d Cir. 1973), the

Second Circuit "affirmed the district court's suppression order because there was an

armed officer between the defendant and the area the evidence was found, i.e. inside a

closet."  See Opp'n at 6.  Here, by contrast, Bohannon was standing next to the bed

when the officers peered under the bed, see Suppression Hr'g Tr. at 108:18–108:23,

and, even if he was eventually "flank[ed] [ ] on either side" by law enforcement officials,

see Opp'n at 6, there were not officers between him and the bed.  Moreover, he had not

yet been handcuffed when either Detective Scholl or SA James looked under the bed;
rather, the officers were in the process of arresting him and he might well have been
able to lurch toward the bed, under which a firearm could easily have been secreted.

Second, the facts of United States v. Blue, 78 F.3d 56 (2d Cir. 1996), also differ
from those at issue in this case. Bohannon urges the court to take heed of the Blue
court's holding that "the 'reach area' is also defined by the restraints on the suspect and
not simply his or her proximity to the area searched." Opp'n at 6 (citing Blue, 78 F.3d at
60). As noted several times above, the officers—both Detective Scholl and SA
James—had not yet secured Bohannon in handcuffs when they examined the area
under Dickson's bed. That being the case, he was not yet subject to any restraints of
which the court would take notice pursuant to Blue. The Blue court also identified the
presence of others in the apartment who might be unguarded or unsecured as a factor
that might militate in favor of finding permissible a cursory search of the area within the
defendant's immediate control. See Blue, 78 F.3d at 60 (distinguishing United States v.
Hernandez, 941 F.2d 133 (2d Cir. 1991)). In this case, both Dickson and her sister
were unsecured and perhaps unguarded.

When, pursuant to an "area" search, SA James lawfully looked under the bed
and saw the bags of white powder, "[h]e identified the substance [in those bags] as
crack cocaine." Suppression Ruling at 4. Notwithstanding Bohannon's suggestion to
the contrary at oral argument, the court is unaware of any case that stands for the
proposition that law enforcement officers may only seize evidence under the plain view
doctrine if the evidence they plainly view is of the type at which their search was
targeted.

"Under the plain view doctrine, a law enforcement officer may seize evidence without a warrant if (1) the officer is 'lawfully in a position from which [the officer] view[s] an object,' (2) the object's 'incriminating character is immediately apparent,' and (3) the officer has 'a lawful right of access to the object.'"  United States v. Babilonia, -- F.3d --, 2017 WL 1371397, at *11 (2d Cir. Apr. 17, 2017) (quoting Minnesota v. Dickerson, 508 U.S. 366, 375 (1993)).  Indeed, in many if not most of the cases in which an officer seizes evidence pursuant to the plain view doctrine, he has arrived at a position from which he can view the obviously incriminating object without having sought that specific type of evidence.  See, e.g., United States v. Walters, -- F. App'x --, 2017 WL 506990, at *1–*2 (2d Cir. Feb. 7, 2017) (summary order) (affirming summarily officers' seizure of laptop bag pursuant to plain view doctrine after entry justified by exigent circumstances).

Here, the officers were in a position from which they could lawfully view the bags of crack cocaine, its "incriminating character" was readily apparent, and the officers had a lawful right of access to the objects.  As such, the seizure of the drugs under Dickson's bed was proper.

Thus, because the search of the area under the bed was valid as a search of an area within Bohannon's immediate control, the drugs under Dickson's bed are not properly suppressed.

        2.      Protective Sweep

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be

hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). Crucially, "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'" Id. at 333. The Supreme Court has therefore held that, "as an incident to [ ] arrest [ ] officers [can], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334. This broad validation of protective sweeps is cabined by the requirement that "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id.; United States v. Hassock, 631 F.3d 79, 86 (2d Cir. 2011) ("Where officers cannot supply specific and articulable facts warranting a reasonably prudent officer to believe that an individual posing a danger is lurking in an area to be swept, we have found lacking an essential element necessary to justify a search under the protective sweep doctrine as defined in Buie." (citing United States v. Vargas, 376 F.3d 112, 117 (2d Cir. 2004))).

Notwithstanding contrary testimony at the Suppression Hearing, see Suppression Hr'g Tr. at 130:3–130:10 (James) ("guesstimat[ing]" that bed was "maybe a foot, eighteen inches" off the ground), several of the pictorial exhibits introduced at that Hearing show that Dickson's bed was so low that nobody could have been hiding underneath it, see Govt. Exs. 5, 15, certainly not in a position from which a person could launch an attack. Therefore, because no "reasonably prudent officer [could] believ[e] that the area" under Dickson's bed "harbor[ed] an individual posing a danger to those on

the arrest scene," see Maryland v. Buie, 494 U.S. at 334, the officers' peek under the bed could not be justified as a protective sweep.

Nevertheless, because the area underneath the bed was within Bohannon's immediate control, the court, on reconsideration and in light of the Second Circuit's opinion in this case, denies Bohannon's Motion to Suppress the drugs found under Dickson's bed.[6]

D.   Evidence Discovered after Consent Search

The government also asks the court to reconsider its suppression of evidence discovered after Dickson consented to a search of her apartment, namely guns, ammunition, cash, drugs, and a scale.  This court previously ruled that Dickson's consent was tainted by the officers' illegal entry, see Suppression Ruling at 19–22, and that, even if the taint had dissipated, her consent was involuntary, see id. at 23–25.  The Suppression Ruling further concluded that the exclusionary rule should be enforced with regard to this evidence.  See id. at 27–29.  Now that the Second Circuit has ruled the officers' entry into Dickson's apartment was lawful, there is no unlawful entry to taint Dickson's consent.  As such, that justification for the court's suppression of this evidence falls away.

In the Suppression Ruling, the court identified two primary grounds for its finding that Dickson's consent was involuntary, even if the taint from the illegal entry had dissipated: first, that the officers threatened to pursue a search warrant for Dickson's apartment, if she did not consent, and second, that they threatened to arrest Dickson

---

[6] This ruling is consistent with the court's note in the Suppression Ruling that there were "good reasons to believe that the officers' search under the bed incident to Bohannon's arrest" would have been valid but for what the court then viewed as their unlawful entry.  See Suppression Ruling at 22.

and her sister based on the drugs they had found, neither of which would have been lawful.  <u>See</u> Suppression Ruling at 27.  Though it concedes that the officers could not have legally arrested Dickson and her sister, <u>see</u> Motion at 17, the government now contends that the officers' statements that they would receive a search warrant were truthful statements, <u>see</u> <u>id.</u> at 16–17.  That being the case, the government suggests that this court should reconsider its ruling that Dickson's consent was involuntary.[7]  <u>See</u> <u>id.</u> at 22.  If the court maintains its view regarding the voluntariness of Dickson's consent, the government argues that the court should revisit and revise its application of the exclusionary rule in this case.  <u>See</u> <u>id.</u> at 22–29.

Bohannon disagrees with the government on each point.  He argues that the officers would have been unable to successfully apply for a search warrant, <u>see</u> Opp'n at 20–23, that Dickson's consent was indeed involuntary, <u>see</u> <u>id.</u> at 23–24, and that the court should enforce the exclusionary rule here, <u>see</u> <u>id.</u> at 24–25.

This portion of the Ruling thus proceeds in two parts: first, the court discusses whether Dickson's consent was voluntary—addressing the subsidiary issue of whether the officers could have obtained a search warrant and reweighing the factors that play a part in determining whether Dickson voluntarily consented—and, second, the propriety of applying the exclusionary rule in this case.

---

[7] At the April 24, 2017 Hearing on the government's Motion, the government made clear that, despite indications to the contrary in its Motion, <u>see</u> Motion at 17–22, it was not asking the court to reconsider the factual finding that Dickson feared that she or her sister would be arrested.  Rather, the government asks the court to revisit its evaluation of the mix of factors informing the decision as to the voluntariness of Dickson's consent.

1.    Voluntariness of Dickson's Consent

As the court noted in the Suppression Ruling, "[w]hether an individual has consented to a search is a question of fact to be determined by the totality of all the circumstances."  Suppression Ruling at 23 (quoting United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993)).  Courts in the Second Circuit look to the following factors in determining the voluntariness of consent: "(1) the age of the consenter; (2) her educational background; (3) her intelligence; (4) the use of physical punishments or deprivations; (5) whether she was advised of her constitutional rights; (6) whether the consenter was in custody; (7) whether guns were drawn; (8) whether the consenter was frisked; (9) whether the consenter was threatened; (10) whether she was in a public area; and (11) whether she was informed that she had the option of refusing consent." Id. (citing United States v. Puglisi, 790 F.2d 240, 243–44 (2d Cir. 1986)).  Both the government and Bohannon substantially agree with this framework.  See Motion at 13; Opp'n at 15–23.

Again, at oral argument, the government made clear that it does not seek to have this court reconsider the various findings of fact it made in its Suppression Ruling.  The vast majority of the factors outlined above point in the same direction they did when the court ruled on Bohannon's Suppression Motion.  Though the court does not recapitulate its exploration of those factors in the same depth it did in the Suppression Ruling, see generally Suppression Ruling at 23–27, it bears noting that several of them still weigh in favor of finding Dickson's consent voluntary.  For example, Dickson possessed a bachelor's degree in criminal justice and had significant work history and a steady demeanor; she also testified that the law enforcement officers allowed her to brush her

teeth and did not handcuff, arrest, or point their guns at her.  See Suppression Ruling at

24.  Certain other considerations weighed against, and still weigh against, finding her

consent voluntary, namely that she was advised of her Miranda rights only after she

consented to the search and that the presence of so many officers in her apartment

made her "fearful."[8]  See id.  Furthermore, the government concedes that one of the

"two more troubling aspects relating to Dickson's consent to search her apartment," id.

at 25 remains present: that the officers had no legal right to arrest either Dickson or her

sister, contrary to their threat to do so, see Motion at 17.

However, the legal considerations that underpinned this court's conclusion that

the officers could not have obtained a search warrant are substantially altered by the

Second Circuit's ruling in this case.  See, e.g., Suppression Ruling at 27 ("The officers'

statements indicating that they would be able to obtain a search warrant and that

Dickson or her sister could be arrested were based entirely on evidence that was

unlawfully obtained.").  The government argues that the threats to obtain a search

warrant were not coercive, because after the Circuit's ruling that the officers' entry was

lawful, law enforcement could have obtained a search warrant based on the evidence

this court has now concluded they could have legally seen in plain view and seized, see

supra Part III.C.1. Bohannon maintains his position that the officers could not, in fact,

have obtained a search warrant for Dickson's residence.  See Opp'n at 20–23.  He

suggests that "Steagald[ v. United States, 451 U.S. 204 (1981)] clearly controls" this

_____

[8] Though the government invites the court to reconsider this latter determination, see Motion at
15–16, it was entirely unaffected by the Second Circuit's opinion in this case.  As such, the court sees no
reason to depart from its prior evaluation of Dickson's testimony on this point.  The court recalls her
testimony in this regard and credits it.

case.  Opp'n at 22.  The court does not agree and concludes that the agents could have obtained a search warrant for Dickson's home.

The court rejects Bohannon's arguments that this case presents a "Steagald-like setting."  Opp'n at 21–22.[9]  Steagald stands for the proposition that evidence discovered in a person's home while executing an arrest warrant for a third party may not be used against the homeowner without the additional protection of a search warrant issued by a neutral magistrate.  See Steagald, 451 U.S. at 214–15.  This is because "a search warrant [is] necessary to protect the privacy interests of a third party whose home was searched for the subject of an arrest warrant."  United States v. Snype, 441 F.3d 119, 133 (2d Cir. 2009).  Here, as the Second Circuit's opinion makes clear, the officers' entry into the apartment was lawful as to Bohannon.  See United States v. Bohannon, 824 F.3d 242, 258 (2d Cir. 2016).  That being the case, the court has concluded above that the search that led to discovery of the drugs under Dickson's bed was lawful.  See supra Part III.C.1.  The law enforcement officers were not obligated to close their eyes to the drugs they had seen (and, indeed, could lawfully seize them).  Rather, they could have included their discovery of that evidence in their application for a search warrant of Dickson's residence, which evidence would surely have satisfied the probable cause requirement, see Illinois v. Gates, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.").

---

[9] Notably, the two times Bohannon makes this claim, he provides no pinpoint citation.

Nor does the court believe that the officers' threat that they would receive a search warrant is problematic by virtue of their word choice suggesting the certainty of the warrant's issuance.  See Opp'n at 22–23 ("[I]t is the fact that the agents told Ms. Dickson that a search warrant 'would' issue, and not 'could' issue, based upon evidence that had already been found [that is problematic].").  The case Bohannon claims is "directly on point" here is in fact distinguishable.  In United States v. Cruz, 701 F. Supp. 440 (S.D.N.Y.1988), Judge Haight based his criticisms of the police officers' conduct not only on their statement that they had the "unquestioned ability" to receive a search warrant, but also that the "representation [that they could obtain a search warrant] was false."  See 701 F. Supp. at 445.  The court concludes that the police officers in this case could have obtained a search warrant and so the relevance of Ruiz is significantly diminished.  Ultimately, because the law enforcement officers' statement that they could obtain a warrant was true, it does not tend to undermine Dickson's consent.  See United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983) ("This statement [that the agent could obtain a warrant], clearly true in light of the ample evidence of illegal activity, does not vitiate the consent since advising a person of the fact that a search warrant can be obtained does not constitute coercion."  (citations omitted)).

Elimination of this prong on which the court rested its Suppression Ruling does not answer the question of whether Dickson's consent was, in fact, voluntary.  Rather, the court must reweigh the factors set forth above, having removed this one.  Having reweighed the factors, in light of the arguments of the government, see Motion at 17–22, and Bohannon, see Opp'n at 15–23, the court again concludes that Dickson's consent was involuntary, due primarily to the officers' threat to arrest her and her sister.

Despite the government's arguments to the contrary, the court finds, based on the testimony at the Suppression Hearing and the court's credibility determinations, that the nature of the officers' threats to arrest both Dickson and her sister overrode Dickson's ability to freely consent to the search. As noted above, there are countervailing factors. However, the threat to arrest Dickson clearly made Dickson fearful, not only of the direct effects of the arrest on her, but also collateral consequences, including the possibility that she might lose her two jobs. See Suppression Ruling at 24. Further, she was quite threatened and upset by the assertion that the law enforcement officers would arrest her sister. Though the Suppression Ruling may not have been as explicit as this Ruling is, the threat to arrest played a far greater role in the court's initial disposition of Bohannon's suppression motion than did the officers' threat to pursue a search warrant. Whereas a homeowner's consent to search in order to avoid a threatened search warrant might rest in large part on a desire to save time, the consequences of an arrest are far more onerous. Thus, the court concludes that the officers' threat to arrest Dickson and her sister so impacted Dickson that she lacked the ability to freely consent to the search, in light of the totality of the circumstances. The evidence derived from the consent search was therefore obtained unlawfully.

>    2.    Exclusionary Rule

Last, the court turns to the question of whether the exclusionary rule should be applied to bar this evidence—the guns, ammunition, drugs, and money discovered following the consent search—from introduction at trial. Not long ago, the Supreme Court "reminded courts [that] suppression is 'our last resort, not our first impulse' in dealing with violations of the Fourth Amendment." See United States v. Clark, 638 F.3d

89, 99 (2d Cir. 2011) (quoting Herring v. United States, 555 U.S. 135 (2009)).  Indeed, "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'"  Herring, 555 U.S. at 141 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)).  "[T]he rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application."  Id. at 141 (quoting Penn. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 363 (1998)).  The extent to which application of the exclusionary rule is proper relies, in part, on the degree of impropriety of law enforcement officers' conduct.  Id. at 143.  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Id. at 144.  Ultimately, only "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence" meets the requisite threshold.  Id.

At the outset, the court notes its agreement with the government that, based on the testimony elicited and evidence presented at the Suppression Hearing in 2014, the officers here did not threaten to arrest Dickson with knowledge that the statement was false.  Nevertheless, the court concludes that the actions of the officers were reckless or grossly negligent.  The Supreme Court issued its opinion in Steagald more than thirty-five years ago, and the government readily concedes that it controls as to the legality of the threat to arrest in this case, see Motion at 17.  Though there may well be some ambiguity as to the boundaries of Steagald's applicability, the threats to arrest made in this case fall comfortably within its confines.  Thirty-five years after Steagald, it is time that law enforcement officers took its holding to heart and not issue threats against

those who reside in a dwelling (Dickson and her sister) that has been entered to execute an arrest warrant as to another (Bohannon). Unlawful conduct of the type at issue in this case is capable of being deterred, and arrest warrants would appear to be executed in the homes of third parties often enough that the prospective benefits of excluding the evidence here are significant.

The government repeatedly suggests that this court has already ruled that "the law enforcement officers involved in this case did not engage in intentionally or recklessly unconstitutional behavior." See, e.g., Motion at 27 (citing Suppression Ruling at 22, 29). However, the portion of the Suppression Ruling from which the government most obviously draws this characterization was the one that found Dickson's consent was tainted by the unlawful entry. See Suppression Ruling at 22. Thus, where the court indicated its belief that the officers' behavior was not intentionally or recklessly unconstitutional, it was discussing the fourth factor ("the purpose and flagrancy of the official misconduct," Suppression Ruling at 19) with regard to whether the illegal entry tainted Dickson's consent.[10] Although the court concluded that the entry was illegal at the time it issued the Suppression Ruling, it never thought that the officers were engaged in a rouse, by which they would manufacture an excuse to enter Dickson's apartment so that they could search it. See id. at 22 ("The government's conduct was not a speculative scheme to find evidence that may exist."). Further, there was no evidence that they overreached by virtue of searching beyond what would have been (and is now ruled) proper, while in the apartment and before the consent was

_____

[10] The section of the Suppression Ruling containing the quote at page 22 is captioned "Dickson's Consent Was Tainted by Illegal Entry and Search." Suppression Ruling at 19.

obtained.[11]  It was this conduct that the court was discussing at page 22 of the

Suppression Ruling.  When the court had occasion to determine the exclusionary rule's

applicability, it determined that it would serve as a meaningful deterrent.  See

Suppression Ruling at 27–29.

　　　The government argues that "all of the evidence shows that [the officers] were [ ]

acting in good faith."  Motion at 26.  To the extent the government seeks to rely on the

"good faith" exception to the exclusionary rule, the court notes that the Supreme Court

has invoked this exception when the law enforcement officer responsible for the

constitutional violation acted in reliance on errors made by others.  See Davis v. United

States, 564 U.S. 229, 238–39 (2011) (citing, inter alia, United States v. Leon, 468 U.S.

897 (1984); Herring v. United States, 555 U.S. 135 (2009); Illinois v. Krull, 480 U.S. 340

(1987)).  Here, by contrast, the officers who threatened Dickson with arrest were not

removed from the entry into her apartment such that any ignorance of its illegality as to

Dickson might be excused.

　　　It is simply not the case that the officers' error in believing they could arrest

Dickson, which led them to threaten her with arrest, is "at most a negligent error."  See

Motion at 28.  Law enforcement officers are expected to keep apprised of developments

in constitutional law relevant to their work, burdensome as that may be, and particularly

when that law is articulated by the Supreme Court of the United States.  This court

concludes that it is either reckless or, at the very least, grossly negligent for those law

enforcement officers to make a threat clearly violating thirty-five-year-old legal

_____

[11] Indeed, the court found particularly important and noted in the Suppression Ruling that "the officers did not initially search the open closet near Bohannon in which the guns were eventually found." Suppression Ruling at 22.

precedent.  It appears very likely to this court that exclusion of the evidence at issue here will deter officers from violating the principle of law set out in <u>Steagald</u> in the future. As for the costs of applying the exclusionary rule in this case, it bears noting that, unlike in the hypothetical situation imagined by the <u>Herring</u> Court, <u>see</u> 555 U.S. at 141 (characterizing "letting guilty and possibly dangerous defendants go free" as "something that 'offends basic concepts of the criminal justice system'" (quoting <u>Leon</u>, 468 U.S. at 908)).  Bohannon will face trial on, <u>inter alia</u>, the evidence discussed earlier in this Ruling.  As such, the benefits of suppression outweigh the costs to our legal system.

Therefore, the court concludes that the ammunition, firearms, drugs, cash, and scale discovered as a result of the consented-to search of Dickson's apartment are suppressed.[12]

## IV.    CONCLUSION

In light of the foregoing, the government's Motion for Reconsideration (Doc. No. 704) is **GRANTED**.  On reconsideration, the Motion to Suppress is **GRANTED IN PART AND DENIED IN PART**, as to the evidence regarding which the government sought reconsideration.  The drugs found under Dickson's bed and the money found in Bohannon's pants pocket are admissible.  The drugs, guns, ammunition, and other evidence derived from the search to which Dickson consented are suppressed.

---

[12] The government has not offered inevitable discovery as a possible justification for avoiding application of the exclusionary rule.  As the government did not raise that issue, the court does not address it in this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut, this 28th day of April, 2017.

                                          \_\_/s/ Janet C. Hall_____
                                          Janet C. Hall
                                          United States District Judge